[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
This matter comes before the court on post-judgment motions filed by both parties. They are: the plaintiff's Post Judgment Motion to Modify Custody, filed May 4, 1999 (#178), the plaintiff's Motion for Post Judgment Restraining Order (#179), and the defendant's Motion To Relocate With The Minor Children-Post Judgment filed May 14, 1999 (#181). Within the defendant's Motion to Relocate, she is also seeking a modification of the custody order.
These motions were heard over eleven trial days at the Regional Family Trial Docket on referral from the Judicial District of New Haven at New Haven. At the hearing, the defendant proceeded first on the presentation of evidence regarding her motions and the plaintiff followed. The court received testimony from the parties, their respective fiance(e)s, a teacher and the principal from the school system of one of the children, a family services counselor, a court appointed psychologist evaluator, a minister, an orthodontist, a relative, a neighbor, and the children's guardian ad litem. Numerous exhibits were submitted as evidence. Counsel submitted trial briefs.
These parties, during their marriage, had two children born to them: Matthew, 12 years old, born June 22, 1987, and Tyler, 9 years old, born November 14, 1990. During the process of their divorce, the parties were unable to agree as to custody and visitation issues. They were referred to the Regional Family Trial Docket. After the initial commencement of their trial, they came to agreement about these issues. They completed their trial on the financial issues. Their Agreement dated May 8, 1998 regarding custody, parental access, parental decision-making and related issues was incorporated into their judgment of dissolution of marriage which was entered on May 12, 1998. Many of the terms of that agreement which became court orders are CT Page 1035 salient to these proceedings and will be referenced as necessary.
The order of the court decreed that, "[t]he parties shall share joint custody of the two subject minor children." By the order of the court, incorporating the parties agreement, there is no designation of either parent as primary custodian; no designation is made of the children's primary physical residence. A Parental Access Schedule (Schedule A) defines when the children are with each parent, as do other provisions of the Agreement regarding school holidays, vacations and school vacations. The majority of the weekly access time with the children is with their mother. Holidays and vacations are split more or less equally on a division of time or alternation of access schedule.
These parents did not conclude their involvement with court processes for very long. In March, 1999, the parties were again before the court on a multi-day hearing on cross motions for contempt and a motion by the children's attorney for an updated study from Family Relations. In his motion, the children's attorney requested the court order an updated custody-visitation evaluation. The court ordered that updated study on March 12, 1999.
The orders of the judgment included the following provisions, "The parties agree that there shall be a review of matters by parties and counsel, including counsel for the minor children within 3 months from the date of the entry of judgment." "The parties shall meet monthly with an individual for a term of six (6) months as a Communications Facilitator. It may [sic] extended upon from that after the six (6) months review at judicial district of New Haven."[1] The motion for a family relations study referenced this latter provision in the text of the motion arguing that the agreement contemplated a court review with study.
The judgment also requires the parties to give 60 days written notice of any planned relocation. At the end of April, 1999, the defendant gave written notice to the plaintiff of her plans to relocate her residence to Chico, California. At the present time, the plaintiff lives in Hamden and the defendant lives in Bethany. Their homes are less than 10 miles of each other. The children attend public schools in the Bethany school districts. The defendant lives with her now husband (when he is in Connecticut) in a home owned by her. The plaintiff lives with his fiance in a home owned by the fiance. Each of the parents' present residences CT Page 1036 have appropriate living arrangements for the children.
Two expert opinions were sought, by way of evaluation and report. The updated family relations study addressed the issue of the defendant's planned relocation. The family relations counselor recommended the defendant be permitted to relocate with the children to California. She acknowledged that she did not consider the same legal standard this court is constrained to consider; instead, from the outset she utilized a best interests standard, based, of course, on her perceptions and conclusions. Much of her information gathered was vitally important to the court in the consideration of the evidence before it, even while the court ultimately did not accept her recommendation. The counselor did not recommend a continuation of joint legal custody. This was largely based upon her conclusion that communication between the parents was abysmal and the children would be living with their mother in California. That conclusion does not shed light on a circumstance where the children stay in Connecticut and live an enhanced amount of time with their father. In fact, the latter was not ever considered as a possibility by her, based upon her understanding of the referral for evaluation from the regional court.[2]
The parties and their children also participated in a psychological evaluation with Sidney Horowitz, Ph.D. "General Statutes 46b-6 allows a trial court to order an investigation in "a pending family relations matter" of any circumstance of that matter, which may be helpful, material or relevant to a proper disposition of the case, including an evaluation of a child's mental state or condition. General Statutes 46b-3 permits a court to employ the services of a psychiatrist, psychologist or family counselor in carrying out such an evaluation. By utilizing these statutory provisions, a trial court may obtain a disinterested assessment of the facts of a particular case in order to dispose of it properly. See Pascal v. Pascal, 2 Conn. App. 472, 479,481 A.2d 68 (1984)." Savage v. Savage, 25 Conn. App. 693, 700,596 A.2d 23 (1991).
On September 9, 1999, the court granted the motion of the attorney for the minor child to also act as guardian ad litem. His presence, therefore, for these proceedings is a dual appointment with the further order that if he perceives a conflict in the dual appointment he should bring it to the attention of the court. He has not done so, and therefore, he served in dual capacity in the hearing on the motions presently CT Page 1037 before the court.
The court has before it both a relocation issue and competing requests to modify the custodial orders. The court first rules on the relocation issue, for the outcome of that, i.e., whether the children will be living in Connecticut or California, is a relevant and substantial fact for the court to consider in considering what custodial order is in the best interest of Matthew and Tyler. However, the findings of fact below are also applicable, of course, to the parties' respective requests seeking a modification of custody, which determination is always determined by the best interests standard. "`(a) In any controversy before the superior court as to the custody or care of minor children. . . . the court may at any time make or modify any proper order regarding . . . custody and visitation. . . . (b) In making any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child. . . . Before a trial court may modify a custody order, it must find that there has been a material change in circumstance since the prior order of the court, but the ultimate test is the best interests of the child. Stewart v. Stewart, 177 Conn. 401,407-408, 418 A.2d 62 (1979)." Brubeck v. Burns-Brubeck,42 Conn. App. 583, 585, 680 A.2d 327 (1996).
The following facts are found by the court. At the time of the dissolution of marriage, the defendant was employed at the University of Connecticut as an Assistant Professor. During the dissolution of marriage trial, on May 13, 1998, under oath, the defendant testified as follows:
"Q: Do you desire to work out-of-state at all?
"A: No, I'd prefer to stay where I am.
"Q: And why is that?
"A: Basically for my children. I think it's in the best interest of my children to stay where they are, in the community that they're in with the group of friends and — and, you know, keep their life as — as stable, and — as possible."
Shortly after the dissolution of the parties' marriage, the defendant received a job offer, which she accepted, as an Associate Professor at the State University of New York (SUNY) at New Paltz. She remains in that employment today. She commutes to CT Page 1038 her employment from her same home as at the time of divorce in May, 1998. Ms. Sudick's responsibilities in that position are teaching, committee work, office hours for students, and original work of her own, including research. Her income in that position is $40,872 per year ($786.00 per week on her financial affidavit). She is on an academic schedule for work requiring her to commute to the campus when class is in session, leaving her free to relax or work from home on school breaks and in the summer. The position is tenure track, which essentially means that if she satisfactorily completes a period of probation, she is eligible for consideration to be a tenured faculty member. In the academic world the hierarchy in the ranking of faculty is lecturer, assistant professor, associate professor and full professor. Her tenure review is scheduled to commence February, 2000.
During these proceedings, Ms. Sudick presented herself as affianced to a gentleman named Frank Armstrong. They married toward the conclusion of these proceedings, on December 20, 1999, which was the day before the last day of evidence. Their wedding date was not announced to anyone. They invited no one. The only individuals present besides the minister who married them were the two children subject of these proceedings, Matthew and Tyler. It was just the five of them in the church. The children were kept out of school for this event which fell on a Monday. When the children were told of the impending wedding date arrangements, Matthew inquired of his mother as to whether it was a secret. His mother replied, "No, your father knows of our plans to marry." The children were with their father the weekend days just before the wedding; they never brought the topic up with him. He did not know of the wedding until he learned of it through Ms. Sudick's testimony on December 21, 1999.
Mr. Armstrong was also employed at the University of Connecticut as a faculty member. Both he and Ms. Sudick are graphic artists; each worked for many years in the private marketplace. Both now seek their respective employment to remain in academia. Mr. Armstrong received an unfavorable review from the University of Connecticut and so his continued employment there was expected to terminate. He left before the last teaching year available to him there. In the winter of 1998-1999 he was actively seeking employment at other academic institutions. Mr. Armstrong applied for positions at East Michigan State University, Arizona State University, California State University at Chico, Skidmore College, Virginia Commonwealth University, CT Page 1039 Texas Tech and Michigan State University. He was offered a position as a tenure track associate professor at Michigan State University which is located in East Lansing, Michigan. The starting salary offer was $57,000. The Michigan State offer was very attractive to Mr. Armstrong, both in terms of the pay offered and the elevation it represented in the academic ranks. He also received a job offer at California State University at Chico as a lecturer, at the pay rate of $51,036 a year. The lecturer position is a temporary position, not a tenure, or career, track. Mr. Armstrong received the Michigan State University offer on or about March 25, 1999; this was before he received the Chico offer. He rejected the Michigan State University offer before he received the Chico offer. He accepted the Chico offer. He is currently residing there and is teaching there in the present academic year.
Mr. Armstrong had applied for the Chico job in December, 1998. There was a job posting for two academic positions in graphic arts at Chico. On his initiative, but with her acquiescence, Mr. Armstrong submitted Ms. Sudick's resume' for consideration for a position there as well. This was done in early December, 1998. This was seven months after the divorce and just 3 months after Ms. Sudick had commenced work at SUNY New Paltz. She applied nowhere else. He did not seek employment for her anywhere else. Ms. Sudick had no dissatisfaction with her employment at that time. Mr. Armstrong had a job interview invitation for February 14, 1999; this was followed by a similar interview granted to Ms. Sudick for on or about March 7, 1999. In mid April, 1999, both Mr. Armstrong and Ms. Sudick received employment offers from Chico. They both accepted them. Ms. Sudick's employment was due to commence in the Fall of 1999 for the 1999-2000 academic year. That was not possible as a result of these proceedings and a court order which presently restrains her from removing the children out of Connecticut while these proceedings are pending. Ms. Sudick informed representatives of Chico State that she was not free to come there for the Fall, 1999-2000 semester because of these proceedings. As a result, she has a contractual deferral to January 20, 2000 from California State University, delaying the onset of her employment until the commencement of the second semester. Her tenure review there would commence February, 2000. The contract Ms. Sudick has with California State University terminates on December 31, 2001.
Ms. Sudick's present employment at SUNY at New Paltz is covered by a contract for the same period, to the end of the academic CT Page 1040 year, 2001. She has been notified that she is being given her review for tenure commencing February, 2001. She is currently gathering all of the documentation necessary for that process. Ms. Sudick currently earns $41,000 per year at SUNY. The Chico State offer pays at $56,000 per year. This represents an increase in come of $15,000 per year gross, or a 36% increase.
Chico State has posted its course offerings on its web site, available through Internet access. As of November, 1999, that posting did not list Ms. Sudick's name as faculty teaching a course. As of the commencement of this trial, Ms. Sudick had not notified anyone at SUNY New Paltz of her intent to leave there if she was permitted by the court to relocate the children with her to Chico, California. During December, 1999, while at the New Paltz campus administering exams, Ms. Sudick was confronted by New Paltz faculty members and administrative officials over this issue. Chico State had modified its posting of its course offerings to list her as teaching faculty for certain courses for the Spring, 2000 semester. As a result of this confrontation inquiry, Ms. Sudick disclosed to the SUNY New Paltz people her plans to relocate to Chico, California and teach there, as of January, 2000, if her children are permitted to move with her. She described the reaction of the SUNY people as "angry."
The defendant was not seeking any alternative employment to her appointment at SUNY at New Paltz when the application process commenced for her for the Chico job. Her then boyfriend, now husband, with her assent, e-mailed her resume' in response to the job posting. She was skeptical about it and really did not give it a second thought. At that time she was not unhappy with her New Paltz employment. The unhappiness she developed evolved over the same timeline in which the Chico position became a real possibility for her. The reasonableness of the location must be considered in the context of her desire to be employed in geographic proximity to Mr. Armstrong. At the time of the application in December, 1998 there was not a mutual commitment from the defendant and Mr. Armstrong to marriage. As of the time in which Mr. Armstrong applied for other positions around the country, Ms. Sudick did not seek employment in those geographic locales. When Mr. Armstrong received an offer for a more lucrative and career track position in East Lansing, Michigan, Ms. Sudick did not even consider relocating there with him, or seeking a professional opportunity for herself in the same locale. If Mr. Armstrong had taken that job, he would have commuted back to see Ms. Sudick in Connecticut on weekends. Ms. CT Page 1041 Sudick did not find East Lansing, Michigan an attractive place to live. Ms. Sudick argues that the Chico, California location is reasonable in light of the difficulty she felt she had in seeking employment in 1998. The problem with that argument is that 1999 presents different job opportunities, and, her employment at SUNY at New Paltz makes her a different and perhaps more experienced candidate than she was previously.
Mr. Armstrong turned down the Michigan State University position because he did not want a commuting relationship with Ms. Sudick back in Connecticut. The irony is he took a lesser job in Chico to be close to the defendant and because it was best for them as a family, without any assurance that the defendant would ultimately join him there. She has been unequivocal in her assertion that she will not move to Chico if the court does not permit Matthew and Tyler to relocate there with her. Therefore, her now husband has sacrificed his career for an illusion.
The parties all concur that the controlling legal authority on the relocation issue is Ireland v. Ireland, 246 Conn. 313,717 A.2d 676 (1998) notwithstanding the different posture of the custodial orders. That is, in Ireland the court was confronted with a judgment that awarded the parents joint custody with primary physical custody to the parent seeking to relocate with the child. Here, there is no designation of primary physical custody in Ms. Sudick. In Ireland the father's time with the child was designated as visitation. Here, both parents' time with the children is described with a different nomenclature, a `parental access schedule.' As a factual matter, the children's time is spent primarily in the physical custody of the mother when school is in session, and otherwise fairly equally divided.
The court will apply the Ireland analysis to the relocation issue because of these factual circumstances. The court does remain concerned, however, that the lack of a primary physical custodian was deliberate and meant to effect the perception of power, and its balance, between these parents. The reasoning behind Ireland emphasizes the different roles of the noncustodial and custodial parents (see discussion of D'Onofrio v. D'Onofrio,144 N.J. Super. 200, 365 A. 227, affd. 144 N.J. Super. 352, 365, A. 2.d 716 (App.Div. 1976), at p. 422 and the Wallerstein and Tanke findings at p. 423-424), a result clearly intended to be avoided with this family, by the very language of the judgment, emanating from their agreement.[3]
CT Page 1042
Ireland utilizes a two pronged test, which also invokes a burden shifting mechanism. "[A] custodial parent seeking to relocate bears the initial burden of demonstrating, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, and (2) the proposed location is reasonable in light of that purpose. Once the custodial parent has made such a prima facie showing, the burden shifts to the noncustodial parent to prove, by a preponderance of the evidence, that the relocation would not be in the best interests of the child." Id. at 428.
The defendant's stated purpose for the relocation of the children with her to California is her procurement of employment. (See motion). This constitutes a legitimate purpose for relocation within the meaning of Ireland. The inquiry, however, must not stop there. The court must now determine whether the defendant has proved by a preponderance of the evidence that the relocation to Chico, California (the "location") is reasonable in light of the legitimate purpose. In considering this, the court must also consider whether it has been shown that the locations's "purpose is shown to be substantially achievable without moving, or by moving to a location that is substantially less disruptive of the other parent's relationship to the child." "[American Law Institute in its Principles of the Law of Family Dissolution; Analysis and Recommendations (Tentative Draft No. 3, Pt. 1, March 20, 1998, § 2.20(4)(5)]." Ireland at 425. Therefore, while the court continues to examine the first prong of Ireland which places the burden on Ms. Sudick to prove by a preponderance of the evidence that the relocation is for a legitimate purpose and the proposed location is legitimate in light of that purpose, in a sense, within that prong, the Supreme Court shifts to Mr. Nighswander the burden of proving by a preponderance of the evidence that the location is not reasonable because the purpose can be achieved without the move or in a way that is less disruptive of and intrusive to his relationship with the children. To that end, exhibits were entered demonstrative of the volume of graphic designer positions available at the time of trial in the Connecticut/New York greater metropolitan area and academic positions available in graphic design throughout the country at or about the time of the commencement of the trial of this matter. There were many. Ms. Sudick is well suited by qualification to some of the positions' requirements, and missing some qualification (mostly multimedia) requirements for some of the positions. Ms. Sudick has not sought any employment anywhere since her hire at New Paltz, other than the Chico position. CT Page 1043 Therefore, she did not explore her ability to find employment at a higher salary closer to home. On the other hand, the plaintiff provided no evidence to the court that there was any probability that she would have secured said employment had she sought it. No vocational expert testimony was provided to the court. Therefore, while there is ample evidence to suggest that if Ms. Sudick was seeking a pay increase, she could have sought it closer to home, there is insufficient evidence to prove by a reasonable preponderance of the evidence, that she would have gotten such a job offer. The court, consequently, finds the location is reasonable in light of the purpose of a better wage, as it came to light at the time the job was offered to Ms. Sudick.[4]
These parents have a tortured and difficult history dealing with each other. When they lived together as a family unit, both were actively involved in the care taking of their children. They were also business partners which allowed for a certain flexibility in their work schedules. Ms. Sudick denies Mr. Nighswander's involvement with the children but ample evidence was provided of it to the court. As the family relations counselor found in September, 1997, "[w]hile Ms. Sudick states that she has been the primary care giver, personal references and professionals indicate that she and Mr. Nighswander were both very involved with the children." These references confirming the mutual involvement of the parents in the children's lives include the children's pediatrician, day care providers and school, all objective reporting sources. The parties separated in May, 1996, when Mr. Nighswander moved out of the family home. For several months after that, there was an interruption in the continuity of the involved relationship Mr. Nighswander had experienced with the boys. He relates it as a period of time that he remained in contact with them but tried to be unintrusive as they tried to adjust to their family break up. Ms. Sudick denies his involvement with the boys, at all, for a period of about six months. The court finds that Mr. Nighswander's perceptions are the more accurate ones. Ms. Sudick was angry and embittered toward Mr. Nighswander during this period of time for "abandoning" his family, which included the assertion that he provided inadequate support. Her anger toward him over these issues was so all encompassing, that the court finds it impaired and still impairs her ability to credit him, at all, for a maintenance of a relationship with the boys, which she knows is vitally important to him. The defendant's hostility and coldness to the plaintiff was apparent from her demeanor on the witness stand in answering questions involving Mr. Nighswander. By CT Page 1044 contrast, the plaintiff did not similarly display such hostility. His regard for the defendant evidenced some frustration but not hostility. "The trial court has the opportunity to view the parties first hand and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant. Leo v. Leo, 197 Conn. 1, 4,495 A.2d 704 (1985); Tutalo v. Tutalo, 187 Conn. 249, 251, 445 A.2d 598
(1982)." Weinstein v. Weinstein, 18 Conn. App. 622, 625,561 A.2d 443 (1989).
The parties attempted to resolve their differences over their parenting roles through mediation with no success. Therefore, the family relations study ensued. Counsel was retained for the children. The plaintiff sought joint custody of the children. He sought an equal sharing of time with the children. He was concerned that the defendant was attempting to limit his access to the children and alienate them from him. The defendant sought sole custody of the children. She stated that it was sufficient for the plaintiff to visit with the children every other weekend and half of secular holidays.
It was observed by the family relations counselor at the time of the report in 1997 that the children had a good relationship with both parents and both were able parents. At that time, the counselor wrote, "Ms. Sudick and Mr. Nighswander have both contributed to the well being and growth of their children. Ms. Sudick, although angry with Mr. Nighswander cannot hold Mr. Nighswander at the periphery. Her parental role is not exclusive. Additionally, Ms. Sudick needs to trust that Mr. Nighswander, as the children's parent will not put them in harm's way and she needs to recognize she cannot control what he does with the children when they are with him." The counselor went on to recommend joint legal custody with physical custody in the mother and a specific schedule of access for the father.
The parties also submitted to a psychological evaluation by Dr. Sidney Horowitz in April, 1998. No formal report was issued. Dr. Horowitz at that time recommended that the parties provide the children some therapeutic counseling to assist them in their adjustment to their family break-up. In May, 1998, the parties were prepared for and commenced a fully contested trial at the Regional Family Trial Docket. It was there that the custody issued settled and the present agreed to orders were entered. CT Page 1045
Dr. Horowitz was once again contacted to provide further evaluation for the purpose of these proceedings. He utilized his 1998 psychological evaluations which included interviews and the utilization of testing instruments: the Minnesota Multiphasic Personality Inventory and the Wechsler Intelligence Scale-Revised with both of the parties. In the 1999 contact with this family, he interviewed both parents and also used a further testing instrument, the Millon Clinical Multiaxle Inventory III. He also performed psychological evaluations of the boys and performed parent/child interactive interviews of each of the parents with the children. Dr. Horowitz prepared a report summarizing his work and recommendations which is in evidence before the court. He also testified at trial.
Both of the parties testified before the court. The dislike of Ms. Sudick for Mr. Nighswander is palpable. She assures the court that she honors him as a father when speaking with the children, that she thinks he is an able parent, and that she will work to preserve his relationship with Matthew and Tyler if she is permitted to relocate with them to California. The vast majority of the evidence before this court is contrary to her assertions and reassurances. In 1997, just two years ago she wrote to Family Relations regarding Mr. Nighswander:
"I also have questions regarding the children's health and safety when they are with their father. He has left the children alone at night in his apartment and his decisions and certain safety precautions are concerning me. He also allows the children to ride in the front seat of cars (which have airbags) and he does not have the children use bicycle helmets. I am not confident in his ability and commitment to monitor Tyler's asthma and provide appropriate treatment."
Tyler's asthma has been an issue of great parental struggle between these people. Each has a different philosophy on how to approach the asthma. Mr. Nighswander does not deny that Tyler has asthma, as Ms. Sudick infers in her testimony. Her desire is to rigidly follow a prophylactic course of treatment with the safest and most protective tools. This is not the preference of Mr. Nighswander. He believes that it is intrusive of Tyler's time and does not free him psychologically from a sense of being ill. He prefers the least intrusive and quickest treatment that would be effective. Both parties looked to the children's pediatrician for guidance on this issue. The pediatrician, Dr. Anderson[5], recommended that both of the parents actively monitor Tyler's CT Page 1046 breathing for a period of time with a peak flow indicator. Ms. Sudick did not do so. She wants the court to believe that she was relieved of this obligation by a subsequent communication with Dr. Anderson. However, the court finds Dr. Anderson credible in his statements to the contrary. Dr. Anderson ultimately abandoned pursuing the peak flow analyses because it was his opinion that if they were to result in a relaxation of Tyler's asthma regimen, Ms. Sudick's resistance to change was strong and persistent.
Ms. Sudick has been found inflexible by other providers to this family. The parties had participated in marriage counseling before their separation in 1996. The therapist who saw them on four occasions found Ms. Sudick difficult and controlling, as reported to the family services counselor who relied on that information in formulating her 1997 joint custody recommendation over Mr. Sudick's request for sole custody[6]. Dr. Horowitz, in her 1998 personality testing on the Minnesota Multiphasic Personality Inventory noted that, "Ms. Sudick responded in a very defensive, guarded and resistant fashion. . . . Projective personality testing . . . seemed to suggest a significant defensiveness and rigidity in her personality style." After evaluating her personality, inter alia, Dr. Horowitz concluded that Ms. Sudick is inflexible in problem solving. The court has come to the same conclusion after listening to her approach to several decision making issues that confronted the parents including but not limited to, the violin lesson on Martin Luther King Day, the make up visitation that had to be court ordered this past summer, and the rejection of Mr. Nighswander as a caretaker for the children when she was late returning from New Paltz, weekly.
The communication between the parties is horrific. Virtually all communication is by facsimile transmission only. Mr. Nighswander initiated this process several years ago after he came to distrust Ms. Sudick when she denied that he had maintained an interest in and contact with the children during the first six months of their separation, as he asserted he had. In fact, that core reason for his mistrust of her remains an issue raised by her in these proceedings. She continued to assert to family services for their 1999 study of custody, visitation and relocation that "when Mr. Nighswander originally left the family home, he had no interest in the children (to the point of not knowing what grade Tyler was in), and now he questions every suggestion or decision she makes regarding the children." Therefore, the basis for his distrust remains. Ms. Sudick and Mr. CT Page 1047 Nighswander were, as a part of their judgment, ordered to attend six sessions with a communications facilitator. The goal, clearly, was to improve the quality and manner of communication between them. The individual selected is a social worker, with a master's degree, at the Yale Child Study Center. They only attended five of the sessions because when the facilitator needed to reschedule the sixth session, Ms. Sudick refused it. Counsel for the minor children, applied to court for an order to require the parties to continue further sessions with the communications facilitator. Mr. Nighswander was agreeable, wanting to continue to improve the quality of their relationship, finding the service beneficial.[7] Ms. Sudick was resistant; she stated that they were not capable of making joint decisions. It was only in these sessions with Ms. Nordhaus, the communications facilitator, that the parties communicated directly and verbally. Ms. Sudick clearly did not understand that it was a forum to begin their communication when she wrote to Ms. Nordhaus on November 2, 1998 (less than six months after the parties' divorce) regarding Mr. Nighswander, "His unwillingness to try to discuss any matters with me directly is very frustrating to me."
The relationship of Mr. Nighswander with Matthew and Tyler will be forever altered if they move to California. The evidence before the court reflects that presently a round trip ticket from New York to San Francisco is, at its least expensive $848.00, ranging to $1,310 round trip assuming a nonstop flight, not through the middle of the night ("red eye"). The flight time is about 6 to 6 hours. On each end of the flight in a travel from the airport, from Connecticut to New York (trial testimony gave estimates of two to two and one-half hours) and from San Francisco to Chico (time estimates of almost two hours). The travel time then is 10 hours at a minimum. The cost of travel, given the income of either of the parties and the time investment in travel prevent any frequency to the trips, whether they are taken by the boys to see their father in his home; or, if he travels to see them around his work schedule. (Mr. Nighswander is employed at a position that has traditional hours, Monday through Friday, roughly 9 a.m.-5 p.m.) Ms. Sudick's proposal for Mr. Nighswander's visitation with the boys is for him to have "visitation with the minor children on alternating school vacations of at least five days, and for six (6) weeks during the school summer vacation commencing July 1 to August 11 each year" and "upon two weeks written advanced notice" in California. The holiday suggestion of visitation is that the mother have Christmas, 1999 [already passed] and the father have Christmas, CT Page 1048 2000. Effectively then, she recommends a schedule that will allow her to have the children with her exclusively during school weeks and weekends, all three day weekend holidays, Thanksgiving break, one-half of school vacations, and, half (six weeks) of the summer break.
Even with telephone and e-mail support to the visitation schedule, the nature of Mr. Nighswander's parenting relationship with his children will transform if they move to California. He will no longer be able to periodically meet and confer with their teachers. He will no longer be able to attend parent orientated events, recitals, plays, assemblies, and other school and extracurricular events showcasing the children's accomplishments. He will no longer be able to make presentations to their classes. He will no longer be there to support them in the challenge and projects they undertake as intellectually "gifted" children. These are all areas Mr. Nighswander has been an active and interested, participating parent.
In the absence of the frequent contact and access available now, the boys' relationship with their father will be largely dependent on Mr. Sudick for its health, sustenance and continuity.
Ms. Sudick wants the court to believe that she credits and supports Mr. Nighswander as a parent to Matthew and Tyler and will do so when they are 3,000 miles away. The court does not find this is likely to occur. Fundamental to her assumption of such a supportive role must be the underlying acceptance of him as a parent, his motivations to parent and his qualities as a good parent. In August, 1999, Ms. Sudick told the family services counselor that the reason Mr. Nighswander is more involved with the children, is because his girlfriend impels him to be.
At that same session with the family services counselor she accused him of being disinterested in his son's violin lessons. However, what is clear is that Ms. Sudick has refused every entreaty Mr. Nighswander has made for the children to bring their violins to his house for practice when they are with him. He has variously offered to pick them up at their home, their school and the like and Ms. Sudick has refused. Her remedy is for him to have different violins on hand for them at his house. This is ridiculous. The children's instruments are transportable and not so fragile that they could not be moved. They are the instruments the children play daily and are comfortable with. The message to CT Page 1049 the children in all this is that Mr. Nighswander is not to be trusted with them. The one day the violin lessons fell on a day Mr. Nighswander had the children, Ms. Sudick objected to his taking the children to the lesson and being there for it. Her reason was that she sits in on the lessons, knows their work, and can work with them during the week if she is present. This too overlooks the obvious. Mr. Nighswander's presence at the lesson would give the boys an opportunity to know that he is interested in and supports their endeavor. The lack of their mother's presence was not going to irreversibly set back their progress. Despite these efforts by Mr. Nighswander, Ms. Sudick asserts his lack of interest and uses it as an example of his inappropriateness as a parent. When Mr. Nighswander attended their recital and sat in the front role she was hurt. This demonstrates a totally self-centered view of her row as a parent. Surely there was room for both up front. Surely, the boys would enjoy seeing both of their parents at their recital, provided, of course, the parents acted properly.
Numerous of the facsimile communications between the parties were put in evidence. Several of the communications relate to the impending move to California. When Ms. Sudick was invited to the university in March, 1999 for an in person interview with portfolio presentation, she took the children with her, and, Mr. Armstrong. The children were not informed that this was an interview for a job, rather that she was invited to make a presentation as a recognition of her work. Mr. Nighswander was not notified at that time (or for that matter earlier) that she had applied for a job in California. Her reason for not notifying him previously was that she did not tell him every time her resume was submitted somewhere because it was such a preliminary stage of the job procurement process. While that is a valid reason at the resume submittal stage, surely she knew that she was among the finalists at the Chico university and had a good likelihood of getting the job. Further, once Ms. Sudick did receive the job offer and accepted it she told the children before she told Mr. Nighswander. He was informed of her acceptance of the job and intention to relocate the children by way of a mailed letter that he received on April 30, 1999. The correspondence was sent by Ms. Sudick to satisfy the judgment provisions of 60 days written notice of intention to relocate the children. The letter made no mention of the children. The letter made no effort to address the children or their relationship with Mr. Nighswander. It was bare notice, focused more on Ms. Sudick's contractual status with the university than on any familial CT Page 1050 status of this family. The entire letter can be re-recited here because it is so brief: "Tim, I have received a verbal offer for a faculty position at California State University at Chico, but have not yet received a written contract. I am planning to relocate to the Chico, California area in mid-July. I will notify you as to further plans as soon as I know of them. Please feel free to ask me any questions."
Mr. Nighswander did exactly that. By facsimile he noted that her letter failed to mention the children or what her intentions were regarding the children or their parenting plan. By then, of course, we now know she had already told the children that the offer had come and they could move there. Mr. Nighswander notified her that he strongly opposed the move as he felt it was not good for the children. He then made inquiry as to what the children knew of all this, since they would be with him shortly. She never answered that inquiry and so when the children came to be with their father he was placed in the dilemma of not knowing what their mother had told them, so as to debilitate him from properly addressing, or declining to address them and interact with them on this most important issue. Ms. Sudick's failure to respond to Mr. Nighswander on this was very poor judgment by her and evidence of a lack of insight as to her conduct's effects on her children and a lack of insight as to the importance of Mr. Nighswander's relationship with the boys.
In Mr. Nighswander's fax to her regarding her notice, he once again renewed his request to her that the boys receive counseling: "As I have expressed to you on a number of occasions, it is important that the boys receive counseling to help them with the stress they are already experiencing. Your new announcement has now greatly increased their level of stress and anxiety, which makes counseling, even if only in the short term, more necessary.[8]"
The impact of this proposed move will adversely effect the quality of Matthew and Tyler's relationship with their father. Matthew has repeatedly expressed concern about his relationship with his father: when the relocation was initially discussed with him by his mother, with his father and, with Dr. Horowitz. He rationalizes it by assuring himself that summer and vacation visitation will be adequate. "A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those CT Page 1051 feelings themselves may be transient. See Lincoln v. Lincoln, supra, 273." Gennarini v. Gennarini, 2 Conn. App. 132, 138,477 A.2d 674 (1984).
The children have verbalized repeatedly their desire to go. The move has been presented to them by their mother as a secure alternative (home and job) to the specter that she has raised with them of having to leave the home and community they have lived in since birth, and, the possible loss of employment by her.
It is axiomatic that children need and seek security. There mother offers them a vision of security in Chico but not where they are. Of course, therefore, they continually verbalize a desire to go. In this context, the court gives little weight to these verbalized feelings and states of mind, of the children.
After evaluating this family, Dr. Horowitz found, that a move such as Ms. Sudick seeks "may prove to be quite unsettling for their well being." He wrote, [these children are attached to their mother and father and should a separation of that many miles occur, the fragility that appear (sic) to be emerging in both Matthew and Tyler may certainly become much greater and lead to much psychological distress. It is unbelievable to me that these children have not been involved in some form of psychological supportive interventions over the past few years. It is an egregious error that support from outside services have not been mandated, if for no other reason, to allow them the opportunity to explore the mixed feelings they have about their loyalties and developmental confusion of their parents' animosity. Having said that, to encourage such a huge move at this time without the psychological supports in place may, in fact, be placing these children at greater risk. To that end, consideration of a "parentectomy"[9] when both parents are soimmensely needed by these children, would only serve to hurt them further.[emphasis added]" Dr. Horowitz goes on to recommend, at the least, a postponement of the decision for a move until the children "can more fully explore and understand the relationship they have with their mother and father." He is worried that a move presently that "a huge wedge may occur between them and their father."
Mr Nighswander repeatedly sought Ms. Sudick's agreement to place the children in counseling. On the one hand, she asserts they did not need it. On the other hand, she states she would not CT Page 1052 agree unless it was sheltered from litigation. Ironically, in August 30, 1999, Mr. Nighswander signed an agreement for counseling for the children that provided that shelter; Ms. Sudick did not. Some testimony before the court inferred her then present counsel failed to present it to her. Regardless, these children have never had the counseling that Dr. Horowitz recommended.[10] Ironically again, had it been accomplished, it might have provided a structure for reassurance that such a large move for the children would not have placed them at such risk of upset from their separation from their father.
The locale of Chico, California does not provide significantly different educational opportunities for the children from what they presently enjoy. While the move to Chico, California offers economic opportunity to Ms. Sudick and, therefore, the children, it would be accomplished with significant adverse impact on both the quality and quantity of their contact with Mr. Nighswander. This would make it very difficult to continue the quality of relationship that exists between the children and Mr. Nighswander. The court finds Ms. Sudick will not make her best efforts to prevent that relationship from deteriorating.
On January 10, 2000, a motion to reopen evidence was filed and heard on January 13, 2000. It was argued and granted. As a result, the court finds the following additional facts. Ms. Sudick has entered into a contract to sell her home, with the closing scheduled for January 31, 2000. The defendant is confronted with a need to have an alternative residence as of that date, that is suitable for her and the children, when they are with her, (provided she has not been granted permission to relocate the children prior to that date.) Ms. Sudick has a close woman friend who has a child Matthew's age, who has offered they share her home with her. The home is in Bethany.
The accommodations are such that Matthew and Tyler would share a room with bunk beds and Ms. Sudick would use the study as her bedroom. Mr. Armstrong would be welcome as well.
The tragic circumstance of this friend, however, is that her husband (who is also the father of her 13 year old son, Matthew's friend) killed himself just eight (8) weeks ago and, of course, she and her son continue to grieve and work on adjusting to there tragic change in the circumstances of their life and family.
The second option Ms. Sudick is considering for her residence CT Page 1053 after January 31, is to stay in the home and share it with the purchaser. There is little that Ms. Sudick or the boys know of the purchaser. They know that she is a single woman, who is an attorney, who boards her horse nearby, who has a Weimaraner dog, and who is a friend of one of their neighbors. Her temperament, living habits, regard for the children, or Matthew and Tyler specifically, her value system and lifestyle have not been discussed by Ms. Sudick with her. In fact these living arrangements apparently have been discussed with in only the most preliminary way.
Ms. Sudick is also meeting with a realtor the week of January 18, 2000 to view two homes that she has been told represent the currently available rental housing stock in Bethany. The rents asked are $1,200 and $1,500 respectively both of which represent a significantly higher monthly payment than her present mortgage. Ms. Sudick is not sure she can afford these rentals and is looking at the two prior discussed options as more realistic possibilities.
Ms. Sudick did not have the home listed for sale during the time of the hearing dates on these motions in November and December, 1999. She had listed it only during the summer and then withdrawn it from the real estate market because of the uncertainty of her position pending the outcome of the relocation hearing.
A neighbor of Ms. Sudick had a key to her home and let her friend in to look at the house. She was interested in buying it. Ms. Sudick resisted her inquiry until a day or two before Christmas, 1999. At that time she signed the contract. This was, also, a day or two after the close of the evidence. Ms. Sudick stated she was receiving pressure from the purchaser and she did not want to lose a good sales price. She also felt financial pressure knowing she owed attorney fees, owed Mr. Nighswander $20,000 upon her remarriage, and was borrowing $8,000 from Mr. Armstrong to pay Ally. Wallace. However, Mr. Nighswander had made no demand for the $20,000, Mr. Armstrong was not pressing her for immediate repayment of the $8,000, her previous attorney was satisfied with periodic payments she was receiving and not pressing for immediate lump sum payment, and her present attorney has not yet rendered a bill and was not pressing for immediate payment. No evidence was presented to the court that Ms. Sudick had a probability of losing the buyer if she either delayed entering into a contract, or, delayed a closing date until she CT Page 1054 could make adequate and deliberate residential planning arrangements.
Ms. Sudick, as a part of her planning, rejects the idea of the children staying with Mr. Nighswander, even temporarily, while her residential circumstances are fluid and unsettled after January 31, 2000. Her reason is that, "the children are comfortable with her." When pressed, she concedes they are comfortable with him but asserts they are more comfortable with her. Apparently, this is without factoring in the real probable choice of their living with a stranger, or, full-time, around the clock, with a grieving family.
Ms. Sudick did not notify Mr. Nighswander that she had sold the property. From December 23 (+/-), 1999 to January 10, 2000, she made no effort to tell him. When she told the boys before Christmas, she tells us that Matthew inquired as to what to say if their father asked a lot of questions about it. She told Matthew that he should tell his father to call her if he had questions. In fact, the evidence discloses that he has never grilled them about issues as is suggested by this testimony.
Ms. Sudick has acted irresponsibly with her precipitous sale of the boys' home without planning before hand to ensure their housing, stability and sense of reassurance and security. Her conduct shows a conscious disregard of the needs of the children. Further, her conduct displays an ultimate disregard, also, for the relationship of the children with their father. Mr. Nighswander should have been informed of the sale: it is important that he knows of important events in the children's lives so that he can provide support and reassurance to them.
Matthew's inquiry to her regarding how to handle this with Mr. Nighswander and, then his and Tyler's subsequent silence about the moving is a disturbing recurrence of the behavior surrounding Ms. Sudick's marriage to Mr. Armstrong. Throughout the course of the hearings, it became patently clear that after virtually all occasions on which the boys have been with their father she elicits everything including even the smallest details of their time with their father. As a result, something has developed in the interrelationship of these boys with their mother that they feel they must reveal to her how they spend their time with their father and seek her authority on how they should relate to their father. This is not healthy. Ms. Sudick has encouraged it, implicitly, by the guarded responses to Matthew. She properly CT Page 1055 should have 1) informed Mr. Nighswander herself of each event and, assured Matthew that he can always speak freely with his father.
This entire circumstance of the sale of Ms. Sudick's house is an exquisite example of the recurrent problems that have emerged in the custodial attitude she has exercised in the care of Matthew and Tyler.
These boys are strongly attached to their mother. Dr. Horowitz has observed that love and bond as well as the children's love and bond with their father. "Once it is definitively established, as it was here, that each parent is loving, caring and otherwise entirely suitable, the court perforce must look to other factors to come to a decision about custody." Seymour v. Seymour,180 Conn. 705, 713, 433 A.2d 1005 (1980).
While the children's bond with their father is very strong, it has been strained by the approach Ms. Sudick has repeatedly employed in keeping him at bay, discounting his involvement and denigrating his value as a parent. While Mr. Nighswander is not without fault, certain enduring values of his have managed to remain, without disturbance, for the benefit of the children. He has continued to seek to work with Ms. Sudick as a joint custodian, even today. He does not exclude her, but continues to attempt to listen to her, while pleading with her to listen to him on major custodial issues. He has not been intrusive of the boys' relationship with their mother: he does not pump them for information; he has been respectful of her as their mother and a person, at all times, around the boys; he has remained a supportive and caring parent to the boys even as they have verbalized to him their wish to live in California with their mother. Mr. Nighswander remains a stable and capable parent, able to consider Ms. Sudick's opinions and concerns.
Since May, 1998, in the short time since then, while the children have lived with her the majority of the time and she has had the responsibility to share joint legal custody, Ms. Sudick has shown a conscious disregard for that responsibility by: hiding from Mr. Nighswander her contemplation of moving to California, lying to him about the purpose of the March, 1999 trip, failed to cooperate in the procurement of counseling for the boys, even though her agreement (and court order) to procure psycho-therapy for the boys and her failure to cooperate in Dr. Anderson's request for peak flow readings on Tyler, so that Mr. CT Page 1056 Nighswander's concerns could be objectively considered. On occasions that she has had to be in New York late, she has kept the children at neighbors until 10 p.m. and other late times, rather than seek to have them stay with Mr. Nighswander for the night. Her reason for doing this is "that they don't have that kind of relationship.' She complains that the one time she tried to reach such an accommodation in the morning, Mr. Nighswander refused. Actually, he was already on a train into New York City when she called him. This is extraordinary passive aggressive behavior by her toward their joint custodial relationship to use this occasion to explain why she did not contact him for caring of the children on recurrent week nights when she was teaching and commuting late into the evening.
Ms. Sudick does not believe Mr. Nighswander is a genuinely interested parent, acting from his own heart. She believes he is motivated to interest only by his fiancee. Therefore, she resents his presence and resents his role. This is bad for the boys. They must be protected from the continuance of this stress to their relationship with their father. Mr. Nighswander will provide support for them in their relationship with their mother. While Mr. Nighswander may not trust Ms. Sudick, he is willing to try to rebuild the trust. He has been solicitous of her needs, whenever possible, for flexibility in parental access time with the boys. The court is satisfied that he is sufficiently respectful of the boys' relationship with their mother that he will not impair it in his enhanced time and custodial rights to the boys.
The court finds that Mr. Nighswander has proven by a reasonable preponderance of the evidence that it is not in the best interest of Tyler and Matthew to move with their mother to Chico, California. The court, in making this finding, has among other factors, been guided by and considered the Tropea factors as mandated by the Ireland court. Tropea v. Tropea, 87 N.Y.2d 727,665 N.E.2d 145, 642 N.Y.S.2d 575 (1996).[11] The court denies the mother's request to relocate the children.
The court finds that there has been a material change in the circumstances of the parties in that they have demonstrated an inability to work with a truly joint decision making, joint custodial arrangement while the children live largely with Ms. Sudick. Further, there has been a material change in the sale of the children's home since birth, certainly not contemplated before the court on May 14, 1998, the date of judgement. Finally, there has been further material change in the increased anxiety CT Page 1057 and adjustment difficulties of the children, as reported by Dr. Horowitz, since the date of the judgment, they having not had the benefit of counseling, and having been exposed to continued inability of their parents to jointly decision-make on many issues, and their mother's attempt to relocate them to Chico, California. The court finds that the following orders are in the best interests of the two minor children, Matthew and Tyler.
1. The court orders that the mother is restrained from moving the children's residence to the Chico area of State of California. Her motion to do so is denied and the plaintiffs motion to restrain is granted.
2. The parties shall continue to share joint legal custody; however, when they have reached an impasse in decision making on any issue, Mr. Nighswander shall be the final decision maker.[12]
3. The court does not alter the schedule of access for holidays, vacations and birthdays.
4. The following schedule of parental access to the children is immediately ordered, utilizing a 14 day (two week, Sunday to Saturday) cycle:
week #1: the children are with their mother Sunday (a continuation from the previous weekend) to school on Monday, and after school until 7:30 p.m.; after school on Wednesday until 7:30 p.m.;
the children are with their father Monday from 7:30 p.m. to school on Wednesday (or if no school, 10 a.m.); from 7:30 p.m. on Wednesday to Saturday (and continuing through the weekend as a part of week #2);
week #2: the children are with their mother Monday and Wednesday after school to 7:30 p.m.; Friday after school to Saturday (and continuing through the weekend as a part of week #1);
the children are with their father Sunday (a continuation from the previous weekend) to school on Monday; Monday at 7:30 p.m. to school on Wednesday; Wednesday from 7:30 p.m. to school on Friday.
This schedule is graphically depicted for case as follows, CT Page 1058 without the time of dinner specified, but shown instead as an intervening time on Monday and Wednesday. ____________________________________________________________________________ | SUN | MON | TUES | WED | THURS | FRIDAY | SAT | |________|_____________|________|____________|________|_____________|______| | | | | | | | | | MOTHER | MOTHER/MOT- | FATHER | FATHER/MOT | FATHER | FATHER |FATHER| | | HER/FATHER* | | H-ER/FATHER| | | | |________|_____________|________|____________|________|_____________|______| | FATHER | FATHER/MOT- | FATHER | FATHER/MOT | FATHER | FATHER/MOTH|MOTHER| | | HER/FATHER* | | H-ER/FATHER| | ER | | |________|_____________|________|____________|________|_____________|______|
The schedule for SUNY New Paltz shows Ms. Sudick teaching into from the early morning into the early evening. At such time as her work schedule will allow her to be home to get the children off to school on Tuesdays, her Monday time with them is ordered to be overnight to school on Tuesday morning. (See * above.)
In the summers, when the children are not enjoying vacation time with either parent, the mother's access time on Mondays and Wednesdays is expanded to the full day, terminating on Tuesday morning at 8:30 a.m. and Wednesday at 7:30 p.m., respectively.
Holiday, vacation and birthday schedules take priority over weekly schedules.
For transportation, where the school is not the place of pick up and drop off, the mother shall pick the children up from the father's house and the father shall pick the children up from the mother's house.
There shall be a sixty (60) day written notice of any relocation planned for the children by either party to the other party.
In regard to counseling for the children, the delay having been so long, the father may select a counselor unilaterally without further consultation with the mother.
After consideration of the arguments about failure to honor the court ordered briefing schedule, as placed on the record, the plaintiff, or his counsel, at his option is ordered to pay to defendant's counsel the sum of $150.00 within 30 days. CT Page 1059
So ordered.
By the Court Munro, J.